THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LAMAR THOMAS, SR.                    :
                                     :
            Plaintiff,               :
     v.                              :     3:10-CV-1946
                                     :     (JUDGE MARIANI)
POCONO MOUNTAIN SCHOOL               :
DISTRICT and DWIGHT PFENNIG,         :
                                     :
            Defendants               :

## MEMORANDUM OPINION

### I.  Introduction

Before the Court is Defendants' Motion to Dismiss Plaintiff's First Amended

Complaint (Doc. 15).  For the reasons set forth below, the Court will grant Defendants'

motion and, for the final time, will grant Plaintiff leave to amend his complaint.

### II.  Factual Allegations and Procedural History

On September 16, 2010, Plaintiff filed a nine-count Complaint against Defendants

Pocono Mountain School District ("PMSD" or "the District") and Dwight Pfennig,

Superintendent of the District, asserting various statutory claims of discrimination and

retaliation and various constitutional claims through 42 U.S.C. § 1983.  (Doc. 1).  Judge

Caputo granted in part and denied in part Defendants' Motion to Dismiss (Doc. 6), finding

that only Plaintiff's retaliation claims under the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. §§ 621 et seq., and Pennsylvania Human Relations Act ("PHRA"), 43

PA. CONS. STAT. §§ 951 et seq., survived the motion.  He also granted Plaintiff leave to

amend the Complaint. (Doc. 13). Plaintiff timely filed his Amended Complaint ("Am. Compl." Doc. 14), and Defendants again moved to dismiss for failure to state a claim upon which relief could be granted. (Doc. 15). Thereafter, the case was transferred to the undersigned. The motion has been briefed fully and is ripe for review.

Plaintiff is an African-American male over the age of forty. (Am. Compl. at ¶¶ 7, 71). He began working as a non-teaching assistant for the District in 1995 and became the Director of Student Support Services in 1998. (Id. at ¶ 8). On his own initiative, Plaintiff used his own resources and fundraised to offer "multicultural programs to all students to defuse the racial strife" (Id. at ¶ 13) that had arisen as a result of the rapidly changing composition of the student body. (Id. at ¶ 10). Soon after he had begun these programs, the District hired Plaintiff to "continue and further the programming." (Id. at ¶ 14). Plaintiff "frequently spoke inside and outside the school district as a citizen on the matter of racial equality" and he created curriculum material for use in schools. (Id. at ¶¶ 100, 101). Despite the District's support initially, Plaintiff faced "strong and longstanding hostility" to his efforts to reduce racial tension. (Id. at ¶ 17). Such hostility took the form of opposition to his efforts by School Board members, teachers, principals, and union officials, including accusations that Plaintiff was a racist and complaints that he had too much autonomy. (Id. at ¶ 18). At some time, a school administrator told Plaintiff "that the [curriculum] material would not be used because Plaintiff was black." (Id. at ¶ 100).

Defendant Pfennig became Superintendent of the District in July 2005. (*Id.* at ¶ 20).

He allegedly told Plaintiff that "he would observe at first and then he would go on the

offensive." (*Id.*). The following year, Defendant Pfennig shouted at Plaintiff "in an angry

tone that Plaintiff was not an administrator and forbade Plaintiff from 'representing' the

Defendant District in a meeting of the Pennsylvania School Board Association." (*Id.* at ¶

21). Beginning in 2008, Defendants would not allow Plaintiff to use the auditorium of a

school for his programs, even though he was willing to pay to use it and others were

allowed to use the space, sometimes for profit. (*Id.* at ¶ 24).

Later that year, Defendants "removed Plaintiff's supervisory duties and then claimed

Plaintiff's lack of supervisory duties as a basis for reclassifying Plaintiff's job from an Act 93

administrative position to a bus driver's union position." (*Id.* at ¶ 27). Unlike Plaintiff, two

other "similarly situated white employees" who were younger than Plaintiff had been

"provided notice and an opportunity to be heard, while represented by legal counsel, on the

question of reclassification." (*Id.* at ¶¶ 28, 72). These two other employees were permitted

to keep their Act 93 classification. (*Id.* at ¶ 29). As a result of his reclassification, Plaintiff

"lost benefits, including but not limited to a reduction of life insurance coverage by

approximately $62,000, an immediately effective increased health insurance deductible, and

less health insurance coverage after retirement." (*Id.* at ¶ 32). The reclassification also

resulted in Plaintiff's placement "at the highest possible salary level with no room for

advancement," whereas previously, "he had been at the low to mid-range of salary with

substantial room for advancement." (*Id.* at ¶ 33). As a result of the job reclassification, the

size of Plaintiff's programs was reduced, and he lost authority to influence the budget and

issue press releases. (*Id.* at ¶ 34-35). Finally, Plaintiff went from being a salaried employee

to an hourly wage employee. (*Id.* at ¶ 36).

Then, in July 2009, Defendant Pfennig shouted at Plaintiff when Plaintiff presented

him with a yearly program list and instructed Plaintiff to terminate a long-term dance

consultant. (*Id.* at ¶ 38). Plaintiff alleges that he was subjected to racial comments from co-

workers including: in February 2010 when a white assistant coach attempted to physically

remove him from the gym; at Plaintiff's grievance hearing against the coach, the principal of

the school defended the coach's actions and told "Plaintiff that he could not go anywhere in

the District he wanted;" and later that year, when a white teacher told Plaintiff "he should

hide because he'd gotten what he was not entitled to all the years of his employment with

the District." (*Id.* at ¶ 39).

Plaintiff was also "subjected to racially-motivated meritless criticism" by other District

employees including: not possessing "extensive formal education;" "grill[ing] by

administrators about his handling of financial matters, as if he'd stolen money;" being

warned by Defendant Pfennig that Plaintiff should refrain from soliciting outside business for

ticket sales at District functions; "being screamed at over the phone by an administrator . . .

over an imagined wrong done" to the administrator's secretary; and being "falsely and

4

publicly accused by a teacher of encouraging minority student dancers to behave in a sexually provocative manner." (*Id.* at ¶ 40).

Plaintiff objected to his treatment, but his complaints went unanswered and were not investigated. (*Id.* at ¶ 43). Such hostility was so pervasive and severe that Plaintiff "left the employ of the District on September 7, 2010, years before he would have had he not been subjected to the discrimination and harassment." (*Id.* at ¶ 47). Plaintiff alleges he was constructively discharged. (*Id.* at ¶ 59).

Plaintiff filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and cross-filed with the Pennsylvania Human Relations Commission ("PHRC") in September 2008. (*Id.* at ¶ 3). He received his right-to-sue letter in September 2010. (*Id.*).

### III.      Standard of Review on Motions for Summary Judgment

A complaint must be dismissed under FED. R. CIV. P. 12(b)(6), if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007). The plaintiff must aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). "[W]hen presented with a motion to dismiss for failure to state a claim, . . . [the] Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210-11

(3d Cir. 2009) (citing *Iqbal*, 129 S.Ct. at 1949). The "Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id*. at 211.

District courts confronted by a motion to dismiss should engage in a two-step analysis. First, the district court should accept all well-pleaded facts as true, but may reject mere legal conclusions. Second, the district court should then determine whether the facts as asserted, establish a "plausible claim for relief." *Iqbal,* 129 S. Ct. at 1950. Thus, a complaint must "show" an entitlement for relief with facts, as a mere allegation that a plaintiff is entitled to relief is insufficient to withstand a motion to dismiss. *See Phillips v. Co. of Allegheny,* 515 F.3d 224, 234-35 (3d Cir. 2008). As the Supreme Court noted in *Iqbal,* "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not show[n] - that the pleader is entitled to relief." *Iqbal*, 129 S.Ct. At 1949. This "plausibility" determination will be a "context- specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.; see also Fowler,* 578 F.3d at 210-11.

## IV. Analysis

### a. Motion to Dismiss

Aside from Count V (ADEA retaliation) which Judge Caputo previously found was adequately pleaded, Defendants challenge the remaining eight counts in Plaintiff's Amended Complaint.

### 1. Counts I, IV, VI: Title VII, ADEA, and PHRA Discrimination Claims

As Judge Caputo articulated, Title VII and ADEA[1] discrimination claims share essentially the same elements of a *prima facie* case. A plaintiff must show that he (1) belongs to a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410-12 (3d Cir. 1999) (Title VII); *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009) (ADEA).

Previously, Judge Caputo found that Plaintiff had not pleaded adequately the final two elements of discrimination. In his Amended Complaint, Plaintiff has addressed some of the deficiencies noted by Judge Caputo. For instance, Plaintiff has clearly alleged that he suffered adverse employment actions in the forms of reduced supervisory duties, reclassification of his job to a less prestigious position, loss of benefits, "including but not limited to a reduction of life insurance coverage by approximately $62,000, an immediately effective increased health insurance deductible, and less health insurance coverage after retirement." (Am. Compl. at ¶ 32). The reclassification also resulted in Plaintiff's placement "at the highest possible salary level with no room for advancement," whereas previously, "he had been at the low to mid-range of salary with substantial room for advancement." (*Id.* at ¶ 33). The size of Plaintiff's programs was reduced and he lost authority to influence the

---

[1] It is "proper to address ADEA and PHRA age discrimination claims collectively." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499, n.3 (3d Cir. 2010). Therefore, the Court will refer to the three separate counts of discrimination under Title VII, the ADEA, and the PHRA as the "discrimination claims."

budget and issue press releases. (*Id*. at ¶ 34-35). These allegations clearly meet the element of adverse employment actions.

However, Plaintiff has again failed to allege facts sufficient for this Court to infer race or age discrimination. Plaintiff has made many allegations of hostility from teachers, administrators, and various other members of the community towards him and his racial integration programs. Such hostility took the form of opposition to his efforts by School Board members, teachers, principals, and union officials, including accusations that Plaintiff was a racist and complaints that he had too much autonomy. (*Id*. at ¶ 18). At some unknown time, a school administrator told Plaintiff "that the [curriculum] material [Plaintiff had created] would not be used because Plaintiff was black." (*Id*. at ¶ 100). Plaintiff alleges that he was subjected to "racial" comments from co-workers including: in February 2010 when a white assistant coach attempted to physically remove him from the gym, at Plaintiff's grievance hearing against the coach, the principal of the school defended the coach's actions and told "Plaintiff that he could not go anywhere in the District he wanted," and later that year when a white teacher told Plaintiff "he should hide because he'd gotten what he was not entitled to all the years of his employment with the District." (*Id*. at ¶ 39). Yet, Plaintiff nowhere identifies the persons who made such statements or took such actions which Plaintiff considers were unlawfully motivated, and with the few exceptions noted herein, does not recite what statements were made and actions were taken which support an inference of unlawful discrimination based on race or age.

8

By way of example, Plaintiff asserts he was "subjected to racially-motivated meritless criticism" by other District employees including: not possessing "extensive formal education," "grill[ing] by administrators about his handling of financial matters, as if he'd stolen money," being warned by Defendant Pfennig that Plaintiff should refrain from soliciting outside business for ticket sales at District functions, "being screamed at over the phone by an administrator . . . over an imagined wrong done" to the administrator's secretary, and being "falsely and publicly accused by a teacher of encouraging minority student dancers to behave in a sexually provocative manner." (*Id.* at ¶ 40). It is not enough to assign the conclusory characterizations to these statements that they were "racially-motivated," where the statements as alleged, on their face, do not implicate matters of race or age.

The above allegations certainly indicate that Plaintiff met with hostility, but the adverse action must have occurred under circumstances giving rise to an "inference of unlawful discrimination." *Jones*, 198 F.3d at 410. Though these statements show hostility directed toward Plaintiff, none of them were made in connection with an adverse employment action, such as Plaintiff's job reclassification which resulted in loss of prestige, loss of future opportunities for promotion, and loss of various financial benefits. Furthermore, most of them contain no reference to race or age discrimination other than Plaintiff's allegations that the speakers were white.

The one exception is the comment by one administrator that Plaintiff's curriculum materials would not be used because Plaintiff was black. However, this statement, by itself, was not an adverse employment action, so Defendants would not be liable for it. Finally, none of these comments or actions that Plaintiff endured were brought about by Defendants. Only Defendants had the authority to impose on Plaintiff the adverse actions outlined above (e.g., demotion, loss of benefits, reduced scope of authority, etc.). However, Plaintiff has not made out a causal connection between the adverse actions allegedly imposed by Defendants and circumstances giving rise to an inference of discrimination.

The allegations made with respect to Defendants themselves also do not establish a prima facie claim of discrimination. When Defendant Pfennig became Superintendent of the District in 2005, he allegedly told Plaintiff that "he would observe at first and then he would go on the offensive." (Id. at ¶ 20). The following year, he shouted at Plaintiff "in an angry tone that Plaintiff was not an administrator and forbade Plaintiff from 'representing' the Defendant District in a meeting of the Pennsylvania School Board Association." (Id. at ¶ 21). Beginning in 2008, Defendants would not allow Plaintiff to use the auditorium of a school for his programs, even though he was willing to pay to use it and others were still allowed to use the space, sometimes for profit. (Id. at ¶ 24). Then, in July 2009, Defendant Pfennig shouted at Plaintiff when Plaintiff presented him with a yearly program list and instructed Plaintiff to terminate a long-term dance consultant. (Id. at ¶ 38). None of these allegations constitute an adverse employment action, nor do they raise an inference of

discrimination. Simply because Plaintiff claims that there was no legitimate and non-

discriminatory reason for Defendants' actions does not make it so. Plaintiff's description of

the treatment he met at the hands of employees of Defendants presents sufficient

allegations of what may fairly be described as harsh, perhaps even insulting, treatment.[2]

But Plaintiff must allege a factual causal link between this treatment and his race or age.

This requirement can be met inferentially or circumstantially, rather than by allegations of

openly expressed race or age-based animus, but it must be met.

### 2. Count II: Title VII Hostile Work Environment Claim

Under Title VII, a plaintiff must allege facts supporting the following legal elements of

a hostile work environment claim:

> (1) he suffered intentional discrimination because of his [race]; (2) the
> discrimination was pervasive and regular; (3) it detrimentally affected him; (4)
> it would have detrimentally affected a reasonable person of the same
> protected class in his position; and (5) there is a basis for vicarious liability.

*Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005). Based on the allegations of the

Amended Complaint, Plaintiff clearly was working in a hostile environment, but it is not

apparent from the face of the Amended Complaint that the hostility was intentionally

directed toward him on account of his race.

Plaintiff alleged that he complained about his hostile work environment, but

Defendants never investigated his complaints or responded in any meaningful way. (Am.

Compl. at ¶ 43). If he had indeed "suffered intentional discrimination because of his race,"

---

[2] This treatment could also support a claim for hostile work environment.

then his subsequent complaint to Defendants and Defendants' inaction could give rise to

liability on Defendants' part.  However, apart from the single statement that Plaintiff's

curriculum materials would not be used because Plaintiff was black (*Id.* at ¶ 100),[3] a single

instance of discrimination does not equate to "pervasive and regular" racial discrimination

for the Court to find Plaintiff has adequately pleaded this claim.

### 3.  Counts III, VII: Title VII and PHRA Retaliation Claim

Plaintiff's Title VII retaliation claim is also inadequately pleaded.  For a Title VII

retaliation claim, a plaintiff also must allege that he (1) engaged in protected employee

activity (2) which caused a defendant (3) to impose an adverse action on that plaintiff.

*Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).  Title VII provides that:

> It shall be an unlawful employment practice for an employer to discriminate
> against any of his employees . . . because [an employee] has opposed any
> practice made an unlawful employment practice by this subchapter, or
> because he has made a charge, testified, assisted, or participated in any
> manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). "Opposition" to discrimination "can take the form of 'informal

protests of discriminatory employment practices, including making complaints to

management.' " *Moore v. City of Philadelphia*, 461 F.3d 331, 343 (3d Cir. 2006).

Plaintiff alleges that he "explicitly notified defendants of his filing of the EEOC charge

of illegal retaliation in September of 2008" in connection with the hostility Plaintiff

experienced thus far.  (Am. Compl. at ¶ 66).  This was protected employee activity because

---

[3] This allegation was contained in the First Amendment retaliation count, but the Court will consider it as part of the hostile work environment claim.

Plaintiff "opposed any practice made an unlawful employment practice," namely his belief that others were discriminating against him. So, Plaintiff has satisfied the first element.

Elsewhere in the Amended Complaint, Plaintiff states he "objected to being treated" with hostility by fellow District employees, but "Defendant failed to investigate Plaintiff's complaints of discrimination and/or failed to take effective action to alleviate the discrimination." (*Id.* at ¶¶ 42, 43). This inaction or "treatment of Plaintiff *because* he complained of discrimination . . . comprised illegal retaliation." (*Id.* at ¶ 67) (emphasis added). At first glance, Plaintiff would appear to have adequately pleaded the second and third elements. However, a close reading of the Amended Complaint shows that the adverse actions he suffered occurred *before* Plaintiff complained in September 2008, thereby precluding any sort of causal relationship between his protected employment activity and the adverse actions.

In Judge Caputo's previous order (Doc. 13), he said:

the complaint at paragraph 33 states "[u]pon learning of plaintiff's allegations of age discrimination, defendant created a hostile work environment . . ." (emphasis added). The immediacy suggested by the words "upon learning" permit the Court to draw the inference that Thomas's demotion was caused by his complaint of age discrimination because of the temporal proximity of the two events.

(Doc. 13, at 15-16). He concluded that the statement that "upon learning of plaintiff's allegations of age discrimination, defendant created a hostile work environment" contained the necessary substantive elements of protected employee activity, adverse action, and a causal link between the first two elements. If the events had happened in that order, the

13

undersigned would agree without reservation. However, in this instance, the undersigned must depart from Judge Caputo's conclusion that Plaintiff's ADEA and PHRA claims were pleaded adequately because the adverse actions of demotion, reduced scope of responsibilities, loss of prestige, loss of promotion opportunities, and loss of benefits all occurred *before* Plaintiff complained[4] (*i.e.* engaged in protected activity) in September 2008.[5]

Therefore, for all three retaliation claims to stand, Plaintiff must allege that in response to his complaints about racial discrimination in September 2008, Defendants retaliated with adverse actions. The only allegation of an adverse action post-September 2008 is Plaintiff's allegation that he "was constructively discharged" in September 2010. (Am. Compl. at ¶¶ 47, 59). The two-year gap between the protected activity and adverse action is not "unusually suggestive" and is insufficient by itself "to create an inference of causality." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). Furthermore, as Judge Caputo noted, though constructive discharge does constitute an adverse action, for a plaintiff to adequately plead he was constructively discharged, he must show that a defendant-employer "knowingly permitted conditions of employment so intolerable that a reasonable person subject to them would resign." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir. 1996). As stated above in connection with his

---

[4] The Amended Complaint says these adverse actions occurred "immediately prior to and in the early months of 2008" or "in or about mid 2008." (Am. Compl. at ¶¶ 26, 27). In Plaintiff's original complaint, he stated that his job was reclassified "effective June of 2008." (Doc. 1 at ¶ 10).

[5] Though Defendants did not move to dismiss Count V (ADEA retaliation claim), a court may *sua sponte* "raise the issue of the deficiency of a complaint under Rule 12(b)(6), so long as the plaintiff is accorded an opportunity to respond." *Travelers Indem. Co. v. Dammann & Co., Inc.*, 594 F.3d 238, 256, n.14 (3d Cir. 2010).

discrimination claims, Plaintiff has not shown sufficiently that he was subjected to discrimination based on either race or age.

### 4. Count VIII: § 1983 Equal Protection Claim

The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. "To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. They must demonstrate that they received different treatment from that received by others similarly situated." *Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009). Furthermore, the statute of limitations for a § 1983 claim arising in Pennsylvania is two years. *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009); 42 PA. CONS. STAT. § 5524(2).

Plaintiff filed his original Complaint on September 16, 2010, meaning any event giving rise to a cause of action on his § 1983 claims (Equal Protection and First Amendment counts) must have arisen after September 16, 2008. Unlike his statutory claims, Plaintiff's constitutional claims are not subject to a requirement that Plaintiff exhaust his administrative remedies.[6]

---

[6] Plaintiff received the right-to-sue letter on September 2, 2010 and timely filed the present lawsuit within 90 days. Thus, his statutory claims appear to be timely. *See Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465 (3d Cir. 2001). Plaintiff could have received the right-to-sue letter earlier, which would have allowed him to bring timely constitutional claims. Though Plaintiff could have filed suit under the PHRA once a year passed from his cross-filing with the PHRC (*see* 43 PA. CONS. STAT. § 962(c)(1)) and could have requested a right-to-sue letter from the EEOC 180 days after he filed his charge on September 22, 2008 (*see* 42 U.S.C. § 2000e-5(f)(1)), it does not appear that he did so.

Plaintiff alleges that "immediately prior to and in the early months of 2008, Defendants removed Plaintiff's supervisory duties and then claimed Plaintiff's lack of supervisory duties as a basis for reclassifying Plaintiff's job from an Act 93 administrative position to a bus driver's union position." (*Id.* at ¶ 27). Unlike Plaintiff, two other "similarly situated white employees" who were younger than Plaintiff had been "provided notice and an opportunity to be heard, while represented by legal counsel, on the question of reclassification." (*Id.* at ¶¶ 28, 72). These two other employees were permitted to keep their Act 93 classification. (*Id.* at ¶ 29).

Because it is obvious from the face of the Amended Complaint that Plaintiff's loss of supervisory duties and reclassification occurred before September 2008, they cannot be the basis for relief on Plaintiff's § 1983 claims.[7] The remaining events from late 2008 onward do not allege facts supporting an equal protection claim. Plaintiff did allege that beginning in 2008 and onward, others were permitted to rent auditorium space whereas he was not. (*Id.* at ¶ 24). However, the basis of his Equal Protection claim was that he was treated differently based on race.[8] Plaintiff's claim of selective permission to use auditorium space

---

[7] Plaintiff may be able to "save" this claim from a statute of limitations challenge if he adequately asserts that Defendants actions somehow constituted "continuing violations" of his equal protection rights. *See Weis-Buy Servs., Inc. v. Paglia*, 411 F.3d 415, 422 (3d Cir. 2005). As for Plaintiff's allegations of disparate treatment made with respect to the allegedly similarly situated white employees, it is unclear whether the events with respect to them occurred at the same time as Plaintiff's loss of duties and reclassification. Plaintiff will be given the opportunity to clarify when this disparate treatment occurred. Plaintiff would do well to avoid pleading the critical allegations in his second Amended Complaint in the passive voice.

[8] "As an African-American, Plaintiff is a member of a protected class. Under the Equal Protection Clause of the United States Constitution, Plaintiff is entitled to the same treatment as are employees who are not African-American." (Am. Compl. ¶ 88).

does not contain an allegation that those who received permission to use auditorium space were not African-American.

### 5. Count IX: § 1983 First Amendment Claim

To establish a First Amendment retaliation claim, a plaintiff must show "(1) he engaged in constitutionally protected conduct, (2) he was subjected to adverse actions by a state actor, and (3) the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action." *Brightwell v. Lehman*, 637 F.3d 187, 194 (3d Cir. 2011). However, when the plaintiff is a public employee, his speech is protected by the First Amendment only if he spoke as a citizen on matters of public concern and not pursuant to his official duties. *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). A plaintiff may show the requisite causal connection through either:

> (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. In the absence of that proof the plaintiff must show that from the evidence gleaned from the record as a whole the trier of the fact should infer causation.

*Lauren W. ex. rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (internal citations and quotation marks omitted).

In 1995, "[o]n his own initiative, using his own resources supplemented by his own fundraising, Plaintiff began offering multicultural programs to all students to defuse . . . racial strife." (Am. Compl. at ¶ 13). Though not within the relevant two year statute of limitations, this is an example of protected speech by a public employee because this activity was not

pursuant to Plaintiff's official duties. However, later that year, "Plaintiff was hired by the top administrators of the Defendant District to continue and further the programming he had begun on a volunteer basis." (*Id.* at ¶ 14). That is, speaking on matters of racial integration became a part of Plaintiff's official duties thereby removing his activities from the scope of First Amendment protection as a public employee.

In Count IX of the Amended Complaint, Plaintiff frequently avers that after 2005, he engaged in this speech in "the course of his employment." (*Id.* at ¶¶ 99, 100, 101). He even says that he engaged in this activity "both in the schools of the District and in the wider community *on behalf of the District*." (*Id.* at ¶ 101). The lone statement which could be construed to show that Plaintiff spoke outside the scope of his official duties is his claim that "he frequently spoke inside and outside the school district as a citizen on the matter of racial equality." (*Id.* at ¶ 100). However, this is a conclusory statement which stands in contrast to the example Judge Caputo gave when he cited *Beyer v. Borough*, 428 F. App'x 149, 153 (3d Cir. Apr. 14, 2011). There, the Third Circuit found that the plaintiff had been speaking as a citizen when he acted "on his *own* time," that is, off the clock. If Plaintiff had alleged that he continued to use his own resources during the relevant time period to implement his programs or if he spoke on these matters of racial integration on his own time, then the Court could conclude that he has pleaded adequately that he engaged in protected activity as a citizen. However, as yet, he still has not done so.

Next, assuming that Plaintiff did engage in protected speech as a citizen within the relevant time frame, Plaintiff must have alleged that he suffered adverse action because of his protected activity. As stated above, the adverse actions with respect to his job reclassification, loss of prestige, loss of future promotion opportunities, and loss of benefits are beyond the two-year statute of limitations. However, Plaintiff has alleged that he was constructively discharged in September 2010 (Am. Compl. at ¶¶ 47, 59, 68), which would be a valid (and timely) claim of adverse action, *see Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167-68 (3d Cir. 2001), provided he also adequately states facts in support of the other legal elements of a First Amendment retaliation claim.

### 6. Punitive Damages

To the extent that Plaintiff is seeking liquidated damages against the District, such claims are cognizable if the defendant-municipality committed "willful violations" of the ADEA. *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 373 (3d Cir. 2004). To the extent Plaintiff is seeking punitive damages, however, the Court will grant Defendants' motion to dismiss the claims for punitive damages against the District because municipalities are immune to claims for punitive damages. *Smith v. Borough of Dunmore*, 633 F.3d 176, 183 (3d Cir. 2011) (§ 1983); *Hightower v. Easton Area Sch. Dist.*, 818 F. Supp. 2d 860 (E.D. Pa. 2011) (Title VII); *Steward v. Sears Roebuck & Co.*, 312 F. Supp. 2d 719, 730 (E.D. Pa. 2004) (ADEA); *Hoy v. Angelone*, 720 A.2d 745, 751 (Pa. 1998) (PHRA).

19

## V. Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss the Amended Complaint and will grant Plaintiff leave to amend his complaint one last time. In so granting leave to amend, the Court notes that Plaintiff's Amended Complaint is thirty-seven pages long and contains 108 paragraphs. It is not the quantity of allegations that matters, but the quality of the allegations. In granting Plaintiff leave to amend once more, the Court is not necessarily looking for *more* factual allegations, it is looking for relevant factual allegations falling within the relevant time period that adequately state a claim.

Plaintiff may very well have valid causes of action, so the Court will grant him one final opportunity to amend his complaint. Plaintiff now has the benefit of two opinions instructing him on what he must allege to survive a motion to dismiss. A separate Order follows.

Robert D. Mariani
United States District Judge

## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LAMAR THOMAS, SR.                         :
                                          :
            Plaintiff,                    :
      v.                                  :      3:10-CV-1946
                                          :      (JUDGE MARIANI)
POCONO MOUNTAIN SCHOOL                    :
DISTRICT and DWIGHT PFENNIG,              :
                                          :
            Defendants                    :

## ORDER

**AND NOW**, **THIS 14TH DAY OF AUGUST, 2012,** upon consideration of Defendants'

Motion to Dismiss (Doc. 15) and all accompanying briefs, **IT IS HEREBY ORDERED THAT:**

1. Defendants' Motion to Dismiss is **GRANTED**.

2. Plaintiff is **GRANTED LEAVE** to file a Second Amended Complaint. **ON OR**

   **BEFORE SEPTEMBER 4, 2012**, Plaintiff shall file a Second Amended Complaint

   which conforms to the instructions contained in the attached opinion.

Robert D. Mariani
United States District Judge